**[J-16-2022] [MO: Donohue]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| SYNTHES USA HQ, INC., | : No. 11 MAP 2021 |
| | : |
| Appellee | : Appeal from the Order of |
| | : Commonwealth Court at No. 108 FR |
| | : 2016 dated July 24, 2020, Judgment |
| v. | : Entered January 21, 2021, |
| | : Reversing the decision of the PA |
| | : Board of Finance and Revenue at |
| COMMONWEALTH OF PENNSYLVANIA, | : No. 1409195 dated January 13, |
| | : 2016 and Remanding. |
| Appellant | : |
| | : ARGUED: March 10, 2022 |

## CONCURRING AND DISSENTING OPINION

**JUSTICE DOUGHERTY**                                  **DECIDED: February 22, 2023**

I join part I of the Majority Opinion holding the Office of the Attorney General (OAG) is permitted to take a position inconsistent with that of the Department of Revenue (Department) regarding the meaning of 72 P.S. §7401(3)2.(a)(17) of the Tax Reform Code of 1971 (amended) (Subparagraph 17).[1] I respectfully dissent, however, from part II of the Majority Opinion rejecting the OAG's position on Subparagraph 17 in favor of the Department's. The OAG argues Subparagraph 17 requires taxation of the sales of services under the costs of performance method. Under this method, a sale is sourced

---

[1] Subparagraph 17 is a uniform law derived from the Uniform Division of Income for Tax Purposes Act (UDITPA). The General Assembly amended Subparagraph 17 in 2013, *see* Act of July 9, 2013, P.L. 270, No. 52, §19, and then amended it again in July of this year, *see* Act of July 8, 2022, P.L. 513, No. 53, §6. This case concerns the version of Subparagraph 17 in effect for the 2011 tax year, prior to the 2013 amendments, and unless indicated otherwise, I refer to that earlier version in my discussion here.

for tax purposes to the location of the seller's operations. Thus, if the seller has its operations in Pennsylvania, the sale is in Pennsylvania and subject to taxation under Subparagraph 17. The Department, on the other hand, contends Subparagraph 17 adopts the benefit received method. This method sources sales to the location where the customer received the benefit of the sale; if the customer received the benefit in Pennsylvania then the sale is taxed under Subparagraph 17. In my opinion, the OAG has the better argument. The plain language of the statute, the contrasting language of the statute *in pari materia* pertaining to taxation of tangible personal property, persuasive authorities from other jurisdictions interpreting this uniform law, and the legislature's own interpretation of the statute support construing Subparagraph 17 to dictate the costs of performance method. Accordingly, I respectfully dissent from the majority's reading.

"The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. §1921(a). "Every statute shall be construed, if possible, to give effect to all its provisions." *Id.* "The plain language of a statute is the best indication of the General Assembly's intent, and where the statutory language is clear and unambiguous, we must give effect to the plain language thereof." *Povacz v. P.U.C.*, 280 A.3d 975, 991 (Pa. 2022). When the words of a statute are not defined in the law and have not otherwise acquired a peculiar and appropriate meaning, they are "construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. §1903(a). "In giving effect to the words of the legislature, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 822 (Pa. 2013). Additionally, statutory language must be construed, so far as possible,

to be consistent with other statutes *in pari materia* with it, that is, statutes relating to the same persons or things or the same class of persons or things. *See* 1 Pa.C.S. §1932. "Statutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them." 1 Pa.C.S. §1927. "When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters[,] . . . [l]egislative . . . interpretations of [the] statute." 1 Pa.C.S. §1921(c)(8). Administrative interpretations of a statute are entitled to deference only "so long as they are consistent with legislative intent." *Street Road Bar & Grille, Inc. v. Pa. Liquor Control Bd.*, 876 A.2d 346, 354 n.8 (Pa. 2005).

Here, the applicable version of Subparagraph 17 provides:

Sales, other than sales of tangible personal property, are in this State if:

(A) The income-producing activity is performed in this State; or

(B) The income-producing activity is performed both in and outside this State and a greater proportion of the income-producing activity is performed in this State than in any other state, based on costs of performance.

72 P.S. §7401(3)2.(a)(17) (amended).

The plain language of Subparagraph 17 thus reflects the legislative intent to adopt the costs of performance method. Indeed, the statute uses this exact term. As the term "costs of performance" is not defined in the tax code, it is appropriate to look to its common and approved meaning. *See* 1 Pa.C.S. §1903(a). "Costs" is, of course, the plural form of "cost." Used as a noun, "cost" is defined as "the amount or equivalent paid or charged for something." *Cost*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cost (last visited Nov. 28, 2022). "Performance" is defined as "the

execution of an action." *Performance*, Merriam-Webster, https://www.merriam-webster.com/dictionary/performance (last visited Nov. 28, 2022). It is the seller who pays to execute a service. To be sure, the seller will typically seek payment from the customer, but that payment is not the amount paid to execute the service. It is not, in other words, the costs of performance. Rather, the customer pays the price charged by the seller for the service, which typically is set at a premium above the bare costs of performance to ensure a profit. Moreover, the seller perforce pays the costs of performance from the location(s) where it is operating, not where the customer receives the service. The legislature's use of the precise term "costs of performance" in Subparagraph 17 was not mere happenstance. This language indicates a clear purpose to source sales to the location of the seller's operational activities and to require the costs of performance method.

The legislature's intent for Subparagraph 17 to mandate the costs of performance method is confirmed by consideration of 72 P.S. §7401(3)2.(a)(16) (Subparagraph 16), which is *in pari materia* with Subparagraph 17. Subparagraph 16 states:

> Sales of tangible personal property are in this State if the property is delivered or shipped to a purchaser, within this State regardless of the f.o.b. point or other conditions of the sale.

72 P.S. §7401(3)2.(a)(16). By explicitly providing for sourcing to where the "property is delivered or shipped to a purchaser," Subparagraph 16 expressly embraces the benefit received method tying taxation to receipt by the customer. Subparagraph 17, by contrast, uses markedly different language. Subparagraph 17 does not refer to delivery, shipment, purchasers, or customers. Quite the opposite; the statute explicitly calls for the costs of performance method by name. Although, based on Subparagraph 16, the legislature

obviously knew how to word a statute to require the benefit received method, it clearly chose not to do so in Subparagraph 17. The General Assembly's choice to use very different words in Subparagraph 17 reflects a different legislative intent as to this distinct provision governing the taxation of sales "other than sales of tangible personal property," namely, to eschew the benefit received method in favor of the costs of performance approach. As this Court has recognized, and commonsense dictates, "when the legislature uses . . . different words, we must . . . presume that 'it must have meant for the words to have separate meanings.'" *Commonwealth v. Elliott*, 50 A.3d 1284, 1290 (Pa. 2012), *quoting Drabic v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing*, 906 A.2d 1153, 1157 (Pa. 2006).

Decisions in other jurisdictions likewise support construing Subparagraph 17 to adopt the costs of performance approach. A number of sister state courts have interpreted this uniform law to mandate the costs of performance formula and source sales to the location of the seller's operations, not the location of the customer. *See Corp. Exec. Bd. Co. v. Va. Dep't of Tax'n*, 822 S.E.2d 918, 921-22 (Va. 2019) (materially identical statute "[a]ppl[ies] th[e] long-accepted 'costs of performance' formula for sales of services"; "UDITPA's, and, therefore, Virginia's, 'costs of performance' sales factor has faced mounting criticism."); *Univ. of Phx., Inc. v. Ind. Dep't of State Revenue*, 88 N.E.3d 805, 811, 814 (Ind. T.C. 2017) (materially identical statute "requires a cost-based analysis, not a market-based or customer-based analysis to determine where to source receipts from service income" and thus department of state revenue "erroneously calculated" University's taxes "by sourcing the University's revenue according to the location of its market, rather than the location of the costs of its income-producing

activities"); *Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, 486 S.W.3d 496, 513 (Tenn. 2016) ("[I]t is undisputed that the [costs of performance] methodology for calculating franchise and excise taxes that Vodafone proposes in its request for refund . . . is consistent with the methodology set forth in Tennessee's franchise and excise tax statutes," which are materially identical to Subparagraph 17); *AT&T Corp. v. Dep't of Revenue*, 358 P.3d 973, 982 (Or. 2015) (Identical statute "does not look to the market where the sales occur. There is nothing specified about the geographic location of the taxpayer's *customers*, which one would expect from a factor focused on a state's contribution to the market. Instead, the provision looks to where the *taxpayer* effectively produces the income. The state where the taxpayer conducts its 'income-producing activity' for a sale or class of sales may or may not happen to be the market state.") (emphasis in original); *AT&T Corp. v. Comm'r of Revenue*, No. C293831, 2011 WL 2243933, at *12 (Mass. App. Tax Bd. June 8, 2011) ("The Commissioner began with what she claimed to be 'income from sales to [AT&T's] customers in Massachusetts' and then analyzed the costs of those sales. However, the purpose of [statute materially identical to Subparagraph 17] is to analyze a taxpayer's costs of performance associated with its income-producing activity and then to use that analysis in order to determine which sales are in Massachusetts."). While these decisions are "certainly not binding on this Court," *Koken v. Reliance Ins. Co.*, 893 A.2d 70, 83 (Pa. 2006), in the context of construing a uniform law like Subparagraph 17, we should "afford these decisions great deference." *Sternlicht v. Sternlicht*, 876 A.2d 904, 911 n.13 (Pa. 2005).

Indeed, our own legislature has joined courts from around the country in interpreting Subparagraph 17 to command the costs of performance method. In 2013,

the General Assembly amended the tax code to add a new provision regarding the taxation of sales of services:

> (C)(I) Sales from the sale of service, if the service is delivered to a location in this State. If the service is delivered both to a location in and outside this State, the sale is in this State based upon the percentage of total value of the service delivered to a location in this State.
>
> (II) If the state or states of assignment under unit (I) cannot be determined for a customer who is an individual that is not a sole proprietor, a service is deemed to be delivered at the customer's billing address.
>
> (III) If the state or states of assignment under unit (I) cannot be determined for a customer, except for a customer under unit (II), a service is deemed to be delivered at the location from which the services were ordered in the customer's regular course of operations. If the location from which the services were ordered in the customer's regular course of operations cannot be determined, a service is deemed to be delivered at the customer's billing address.

72 P.S. §7401(3)2.(a)(16.1)(C) (Subparagraph 16.1).[2] By expressly sourcing the sale of services to the location where the "service is delivered" and expressly referencing the "customer," Subparagraph 16.1 very explicitly adopts the benefit received method for sales of services, just as Subparagraph 16 quite expressly adopts this approach for sales of tangible personal property. The General Assembly's enactment of Subparagraph 16.1 reflects its interpretation of Subparagraph 17 to call for the costs of performance methodology rather than the benefit received approach. Otherwise, the General Assembly would not have deemed it necessary to promulgate Subparagraph 16.1 and change the law. And because legislative interpretations are probative of legislative intent, *see* 1 Pa.C.S. §1921(c)(8), Subparagraph 16.1's manifest endorsement of the benefit received method indicates Subparagraph 17 was not intended to do the same. *See*

---

[2] The General Assembly also made a related amendment to Subparagraph 17 excluding from this provision sales under Subparagraph 16.1.

*Masland v. Bachman*, 374 A.2d 517, 521 (Pa. 1977) ("A change in the language of a statute ordinarily indicates a change in legislative intent.") (collecting cases in footnote).

The majority's arguments to the contrary are not persuasive. The majority contends "colorable arguments can be made that the 'income-producing activity' occurs either where the taxpayer produces the service or where the customer receives the service." Majority Opinion at 50. However, the term "income-producing activity" does not appear in a vacuum. This term is accompanied in Subparagraph 17 by the operative term "costs of performance." As discussed, the latter term clearly calls for a seller-based sourcing methodology. It is the seller who pays the costs of performance, *i.e.*, the amounts necessary to effectuate the service. These expenses are not borne by the customer, although the customer does generally pay a price, typically an amount above costs, for the seller's performance of the service. Any ambiguity as to whether the term "income-producing activity" refers to actions by the seller rather than receipt by the customer is removed by the seller-focused "costs of performance" language. The "costs of performance" terminology clarifies that "income-producing activity" refers to the seller's conduct in producing the service. Again, in construing the words of a statute, we are not to interpret them in artificial isolation, but rather must read them in the full context in which they appear. *See Roethlein*, 81 A.3d at 822.

The majority "find[s] that the relevance of other states' interpretation of their sales of services provisions [is] somewhat diminished given the variations in the regulations adopted and the amendments enacted, which all result in reduced uniformity." Majority Opinion at 51. I do not disagree that cases construing amended versions of Subparagraph 17 should not inform our analysis. These precedents involve different

statutory language, and we should not be comparing apples to oranges. I do, however, part ways with the majority's suggestion that cases interpreting the same or essentially same statute are unpersuasive if they are from jurisdictions with regulations implementing the costs of performance method. "It is axiomatic that a statute is the law and trumps an administrative agency's regulations." *Commonwealth v. Kerstetter*, 62 A.3d 1065, 1069 (Pa. Cmwlth. 2013). The numerous courts construing laws uniform with Subparagraph 17 to provide for the costs of performance approach would not have done so unless they interpreted the words of the statutes themselves to support this methodology, irrespective of the language of implementing regulations.

The majority posits "[i]t would be incongruous to apply diametrically opposed sourcing methods . . . by applying destination sourcing to Subparagraph 16 but origin sourcing to Subparagraph 17." Majority Opinion at 54. Yet there is nothing at all inconsistent, odd, or unusual about different types of transactions (in this case, sales of tangible personal property on the one hand and sales of non-tangible personal property on the other) being taxed in different ways. Indeed, this is commonplace. *See Pharmacy Corp. of Am. v. Dep't of Revenue*, 456 P.3d 408, 413 n.4 (Wash. Ct. App. 2020) ("[B]usinesses can engage in many types of transactions and these transactions are routinely taxed based on their individual natures.") (citations omitted).

The majority contends the dramatically different language in Subparagraphs 16 and 17 is explained by "the inapplicability of the same terminology to the subjects addressed in those provisions." Majority Opinion at 54. Subparagraph 16.1 refutes this argument. Subparagraph 16.1, which, as the majority acknowledges, "explicitly" and "unambiguously" applies the benefit received method, *id.* at 11-12, uses the same,

"simple" delivery terminology as Subparagraph 16. *Id.* at 54. Just as Subparagraph 16 sources the sale of tangible personal property to where "the property is delivered[,]" 72 P.S. §7401(3)2.(a)(16), Subparagraph 16.1 sources the sale of a service to where "the service is delivered[.]" 72 P.S. §7401(3)2.(a)(16.1)(C)(I). As Subparagraph 16.1 makes clear, the terminology of Subparagraph 16 "applies coherently" to sales of services as well. Majority Opinion at 54. The legislature certainly could have used this language in Subparagraph 17 but chose not to because this wording would have been incompatible with its purpose to adopt the costs of performance method.

Finally, I disagree with the majority that "the 2013 amendments" were not "an attempt to alter the general framework for sourcing sales" but rather "an attempt to clarify the sourcing of sales of services to the point of delivery to the consumer[.]" *Id.* at 55. The pre-amendment version of Subparagraph 17 broadly applies to all sales "other than sales of tangible personal property[.]" 72 P.S. §7401(3)2.(a)(17) (amended). Nothing in the expansive wording of this provision suggests sales of services are exempted from its reach. The legislature's determination in 2013 to carve out sales of services, exclude these transactions from the costs of performance language of Subparagraph 17, and enact a new Subparagraph 16.1 applying the benefit received approach to this particular type of sale, constituted a clear change in the law, not a mere clarification of existing law.

For the foregoing reasons, while I join part I of the Majority Opinion, I respectfully dissent from part II.[3]

---

[3] Synthes claims applying the costs of performance approach to it here would violate the Uniformity Clause of the Pennsylvania Constitution, *see* PA. CONST. art. VIII, §1 ("All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws."), because (continued…)

"[t]he Department has a consistent and deliberate policy at audit and at all appeal levels of interpreting Subparagraph 17 as requiring taxpayers to compute the sales factor using the benefit-received method."  Synthes's Brief for Appellee at 14.  But Synthes does not have a constitutional right to the continuation of the Department's past errors in misconstruing Subparagraph 17 to require the benefit received method.  *See Commonwealth v. Molycorp, Inc.*, 392 A.2d 321, 323 (Pa. 1978) ("Mere errors in assessment will not support a claim of violation of uniformity of taxation.") (citations omitted); *Commonwealth v. Westinghouse Elec. Corp.*, 386 A.2d 491, 494 (Pa. 1978) ("'[N]o errors or misinformation of [the Commonwealth's] officers or agents can estop the government from collecting taxes legally due[.]'"), *quoting Commonwealth v. Western Md. Ry.*, 105 A.2d 336, 341 (Pa. 1954) (second alteration in original); *Stilman v. Tax Rev. Bd., City of Phila.*, 166 A.2d 661, 662-63 (Pa. 1961) ("Prior error by an administrative official when interpreting a valid tax statute is insufficient, in itself, to constitute a violation of the rights of due process and equal protection of the laws.").