IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| APOLLO EDUCATION GROUP, INC. AND SUBS., | ) ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 150352C |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

This case concerns the apportionment of income generated from the online courses

offered by Plaintiffs' largest wholly owned subsidiary, the University of Phoenix. Plaintiffs

appealed Defendant's Notices of Assessment for the periods ending on August 31 in 2009, 2010,

and 2011. A trial was held from November 15 to 17, 2016. Theodore R. Bots and Jenny A.

Austin, attorneys-at-law in Illinois, appeared *pro hac vice* on behalf of Plaintiffs. Several

officers of the University of Phoenix were called as witnesses: David Brett Romney, Vice

President of Enrollment at the School of Business; Kristen Kathleen Griffin, Vice President of

Student Services; Bronson Ledbetter, Vice President of Financial Services; and Kristi Lynn

Moreno, Dean of Curriculum and Content Services. Also testifying for Plaintiffs were William

Ralph Molina, Plaintiffs' Senior Director of Federal and State Tax, and James Donald Allen III,

Partner/Consultant at BI Solutions Group, LLC. Darren Weirnick and James C. Strong,

Assistant Attorneys General, appeared on behalf of Defendant. Testifying for Defendant were

Michele Henney, Program Manager of the University of Oregon's Finance and Securities

---

[1] This Final Decision incorporates the court's Decision, entered August 4, 2017. The court's Decision allowed Plaintiffs 14 days to respond if they disputed the calculations of 2009 and 2010 Oregon receipts provided by Defendant. The court did not receive a response from Plaintiffs or a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

Analysis Center, and Jason Michael Larimer, Operation and Policy Analyst 3.

The parties' Joint Stipulated Exhibits 1 to 27 were admitted. Plaintiffs' Exhibits 1 to 12 and Defendant's Exhibits A to D and K to L were admitted without objection. Defendant's Exhibits M, P, and two others not offered were the subjects of a motion *in limine* to exclude by Plaintiffs. The court granted the motion *in limine* as to Exhibit M and denied it as to the other exhibits. Defendant's Exhibit P was thereafter admitted without objection.

## I. STATEMENT OF FACTS

During the tax years at issue, the business of the University of Phoenix (the university) was higher education. (Stip Ex 1 at 4.) The university offered degree programs spanning from associate to doctoral levels, focusing on the market of "nontraditional students." (Ptfs' Opening Br at 4; Stip Ex 1 at 11.) The average University of Phoenix student had over 15 years of work experience, and over 70 percent of students had "full- or part-time jobs, families, or both." (Ptfs' Opening Br at 5.) The university's business model was designed to accommodate its students' time commitments and to "promote retention and degree completion for students who are new to higher education." (*Id*.)

To accommodate the varied schedules of its students, the university implemented what it calls its "Online Campus"—a process for offering courses, related materials, and student services over the Internet.[2] (*Id.* at 6.) The university offered 164,623 and 185,567 online course sections in 2009 and 2010, respectively, each taught by at least one faculty member and composed of a separate group of students. (*Id*.) Online Campus course sections were offered year-round,

/ / /

typically launching every week and running for five weeks. (*Id*.) Students typically completed

---

[2] The university also offered courses at traditional, physical campus locations, the income from which is not at issue in this case.

one online course section at a time. (*Id*.)

Students accessed the university's Online Campus through a software platform known as the "eCampus." (*Id*. at 7.) The eCampus was composed of a set of student resources (library, online tutoring, gradebook, workshops, account summary, and career services) and a classroom environment, which included course-section-specific resources such as the syllabus, eBooks, course materials, and assignments. (*Id*.) The classroom environment was designed for asynchronous class participation; faculty and students could fulfill course requirements by posting to various classroom forums at any time. (*Id*.) The eCampus was developed entirely outside of Oregon. (*Id.* at 8.)

The eCampus classroom environment differed considerably from the traditional classroom. The role of the faculty in teaching was recast as facilitator rather than lecturer—a "guide on the side" rather than a "sage on the stage," as Moreno testified. Three forums were identified within the online classroom. Faculty would post discussion questions for students' responses on the main forum, and the responsibilities of both faculty and students were quantified in terms of a number of days per week each must post. (*Id.* at 7–8.) In the learning team forum, students would collaborate with one another to complete small group assignments. (*Id*. at 8.) An additional individual forum allowed for one-on-one interactions between students and faculty members. (*Id*.)

The role of the university's faculty members in course design was greatly diminished from the professor's traditional role. (*See id.* at 10.) In order to ensure consistency and quality across each course section, the university centrally developed a curriculum for each course it offered. (*Id*. at 8–9.) The university's Arizona-based curriculum development team mapped out each course in detail, setting not only that course's topics, objectives, and schedule, but also

selecting all the course materials and writing all the discussion questions and assignments. (*Id.* at 9.) Faculty had limited authority to modify some assignments—those not designed to measure program outcomes—to add supplementary course materials, and to modify discussion questions. (*Id.* at 10.)

On average, the curriculum development team's approximately 70 instructional developers each revised 16 of the university's 2,500 courses each year. (Tr at 209–10.) The courses were usually revised on a one- to three-year cycle, depending on subject matter and student feedback. (*Id.* at 210–11.) Moreno testified by way of example that the team would aim to revise an information systems and technology course every year, whereas the schedule for revising a math course would be less frequent. (*Id.*)

To promote student retention from matriculation to graduation, the university assigned each student a "Graduation Team," consisting of an enrollment representative, a financial advisor, and an academic counselor.[3] (Ptfs' Opening Br at 11.) The "vast majority" of Graduation Teams for Online Campus students were located in Arizona, "with only one individual in Oregon." (*Id.*)

Enrollment representatives each worked from a database of 500 to 1,000 people, which included both prospective students and students recently enrolled by that representative. (Tr at 65.) Enrollment representatives typically made 60 to 80 telephone calls per day. (*Id.*) The representatives' calls to prospective students involved cultivating relationships, getting to know the prospect's goals and challenges, demonstrating that a degree from the university was both valuable and achievable, and showing the prospect how to enroll. (*See id.* at 66.) On average, an enrollment representative would enroll 10 new students per month. (Tr at 101.) Once the initial

---

[3] Plaintiffs' witnesses referred to the last role as "academic advisor" and "academic counselor" interchangeably, and abbreviated the position "AC."

steps of enrollment were taken, the representative would begin an "enrollment contact strategy" of telephone calls and e-mails before and after registration. (Ptfs' Ex 3; Tr at 68–70.) Highlights of the enrollment representative's scheduled contact with enrolled students included a "pre-walk" before students registered for their first class, a 30- to 60-minute "walk to class" on the first day of class, and weekly check-ins during the student's orientation session and first class. (Ptfs' Ex 3.) All told, enrollment representatives would place 12 to 15 telephone calls to newly enrolled students before handing those students off to an academic counselor after they began their second class. (Ptfs' Ex 3; Tr at 96.) Enrollment representatives were not scheduled to contact students after that, although it was "not uncommon" for individual students to contact their enrollment representatives again with questions arising during their first four classes. (Tr at 96–97.)

Financial advisors were "responsible for educating students on the financial repercussions of a degree and assisting through the logistics of making financial arrangements." (Ptfs' Opening Br at 14.) They ensured that students would be able to pay for every course taken at the university. (*Id*. at 15.) Financial advisors created personalized financial plans for each student, assisted with applying and reapplying for financial aid, and provided financial counselling. (*Id.*) Before every course section, a financial advisor would review each student's financial report and clear that student for attendance. (*Id.*) The role of the financial advisor was distinct from billing, which was handled in a separate department. (*Id.*)

Academic counsellors served as "the main liaison between the student and the University of Phoenix." (*Id.* at 13.) They would contact the students assigned to them before each course began. (*Id.*) They also contacted students who were in danger of not meeting some requirement—for example, attendance requirements or grade-point-average requirements. (*Id.*

at 14.) They were available as a point of contact for students with questions and problems interfering with their academic career. (*Id.*) Academic counsellors were the "catchall" for dealing with all problems other than enrollment and financial aid. (Tr at 116.)

As evidence of where the greater proportion of the university's costs of performance for its online course sections was incurred, Plaintiffs submitted a detailed cost study prepared by their expert, Allen, for the periods ending in 2009 and 2010. (Ptfs' Ex 11.) An exhibit to the cost study identified, for every course section with any Oregon costs, the costs to Plaintiffs of performing the following associated activities: academic advisory, classroom instruction, curriculum development, online enrollment representatives, financial advisory, and PSD (the eCampus platform). (Ptfs' Ex 12.) For each activity, Allen's exhibit identified the costs incurred in each state and the total costs of each section. (*Id.*)

Plaintiffs have asked the court to declare Defendant's notices of assessment void. While maintaining that Plaintiffs failed to bear their burden of proof, Defendant suggested that the evidence for the periods ending 2009 and 2010 was sufficient for the court to redetermine the deficiency for those years using cost-of-performance apportionment under ORS 314.665. (Def's Post-Trial Br at 23.) In the alternative, Defendant asked the court to uphold or redetermine its assessments using an alternative method of apportionment under former ORS 314.670. (Answer at 5.)

## II. ANALYSIS

This case concerns which receipts from the university's Online Campus belong in the numerator of Plaintiffs' sales factor under ORS 314.665 for the tax periods at issue.[4] Also at stake are the failure-to-pay and substantial-understatement penalties assessed by Defendant.

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2007. The relevant statutes did not materially change in subsequent years.

Because the court concludes that Defendant's requested application of ORS 314.665 is correct, it does not address Defendant's alternative claim for apportionment under former ORS 314.670.

Taxpayers doing business in multiple states are potentially subject to taxation in multiple states, with each state's laws determining the portion of total income subject to that state's tax. Business income is apportioned to Oregon by multiplying the income by the "sales factor." ORS 314.650. The sales factor is "a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." ORS 314.665(1). The sales factor numerator is thus found by identifying which of a taxpayer's "sales" occurred "in this state."

A.      *Plaintiffs' Items of Income*

What are a taxpayer's "sales?" By definition, the term *sales* refers to "all gross receipts" from transactions and activity in the regular course of each of the taxpayer's trades or businesses. ORS 314.610(7); OAR 150-314-0425(1). A taxpayer's sales for a given area are thus the total of all its receipts for that area. The regulations use the term "item of income" to refer to a particular receipt. *See* OAR 150-314-0435(2).

In previous litigation, Defendant took the position that " 'item of income' means an individual exchange between a buyer and a seller." *AT&T Corp. v. Dept. of Rev.*, 357 Or 691, 712, 358 P3d 973 (2015) (*AT&T II*). In other words, the item of income is the receipt from an individual exchange. The Supreme Court deferred to Defendant's "narrow interpretation" as plausible and not inconsistent with any source of law. *Id*.

Here, the parties agree that Plaintiffs' pertinent item of income was the tuition and fees it received from a single course section. (Ptfs' Opening Br at 27; Def's Post-Trial Br at 5.) Because one course section contains multiple students, the question arises whether Defendant

has broadened its interpretation of an item of income from the "individual exchange between a buyer and a seller." *AT&T II*, 357 Or at 712.

Defendant's stipulation does not broaden that definition in the case of a taxpayer that "sells" one service to multiple customers. As discussed below, identifying an item of income is an initial step to identifying the costs of performance associated with the item's income-producing activities. Where a taxpayer provides a single service for which multiple customers are charged—here, providing an online course section to multiple students—the income-producing activity and its associated costs does not vary by the number of customers. The taxpayer's "half" of the transaction is the same, no matter how many customers pay for the privilege of enjoying it. So whether Plaintiffs allocated their costs among all of their students or merely among each of their course sections, the amounts and locations of those costs would be the same. The parties' stipulation simplifies the math but does not change the result. The court accepts the parties' agreement to treat the gross receipts from individual course sections as items of income.

B.     *Plaintiffs' Total Sales in this State*

While the sale of a tangible good may be readily located, further analysis is required to determine the location of a sale of something intangible—like Plaintiffs' educational services. ORS 314.665(4) provides:

> "Sales, other than sales of tangible personal property, are in this state if (a) the income-producing activity is performed in this state; or (b) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance."

///

So, to identify whether an item of income arising from the sale of something other than "tangible

personal property" is includible in the numerator of the sales factor, one must identify (1) the income-producing activity; (2) the costs of performance of that activity; and (3) the location where those costs of performance were incurred. If the costs of performing the activity were greater in Oregon than in any other state, the item of income from that activity is includible in the numerator of the sales factor. If more costs were incurred in another state, the item of income is not includible.

The court will examine in turn each step in the analysis as applied to Plaintiffs' income from its online course sections, beginning with identifying Plaintiffs' income-producing activities.

1. *Plaintiffs' Income-Producing Activity*

A relevant portion of OAR 150-314-0435(2)—the regulation implementing ORS 314.665(4)—states: "The term 'income producing activity' applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit." Therefore, a taxpayer's "income-producing activity" is a composite of "transactions and activity" that bear three qualities:

> "The 'transactions and activity' that constitute the 'income-producing activity' must have three qualities: they must be 'directly engaged in by the taxpayer'; they must be done 'in the regular course of [the taxpayer's] trade or business'; and they must have the 'ultimate purpose of obtaining gains or profit.' "

*AT&T II*, 357 Or at 712 (alteration in original). In addition, the requirement that the income-producing activity be applied to "each separate item of income" limits the scope of a company's activity that qualifies. The "item of income" is the seller's receipt from an individual exchange

/ / /

with a buyer. *See id.* "[T]he 'income-producing activity' consists of those transactions and

activity that produced each individual sale[.]" *Id.* at 715.

The *AT&T* cases illustrate the point. A telephone company's business model included maintaining a global network, a large share of the costs of which was incurred at its network headquarters in one state. *See AT&T II*, 357 Or at 693–94. As an internal management tool, the company allocated a share of those network costs to each of its lines of business—its consumer voice, business voice, and business data lines. *AT&T II*, 357 Or at 696–97; *AT&T Corp. v. Dept. of Rev.*, TC 4814, WL 119850 at *5 (Or Tax Jan 12, 2012) (*AT&T I*). The company sold access to its network both by the call and by the month. *AT&T II*, 357 Or at 715. The company erroneously treated each line of business—rather than each individual sale—as an item of income and, as a result, treated the activities associated with global operation of its network as income-producing activities. *See AT&T II*, 357 Or at 697. That "network-focused" selection of income-producing activities was "too broad." *Id*. at 715. Instead, the court concluded, the proper focus was on each transaction—each phone call or by-the-month bill. *Id.*

A taxpayer's income-producing activity, then, is the activity the taxpayer obliges itself to perform when it accepts money from a customer. It is the service the taxpayer's customer has a right to expect. In *AT&T*, the taxpayer sold individual telephone calls to its customers. It maintained its own network for that purpose, but it might have leased transmission capacity on some other network, as it apparently did with local exchange carriers. *See AT&T I*, 2012 WL 119850 at *1. It might have changed its network to adopt a new technology, such as replacing copper wires with fiber-optic cables. By selling telephone service to its customers, AT&T did not bind itself to maintain a network in its current form. It was the telephone service, not the

/ / /

network, that its customers bought, and it was the telephone service that was the income-

producing activity.

ORS 314.665(4) does not contemplate multiple income-producing activities associated with one item of income. Instead, the statute and accompanying rule refer to a single income-producing activity composed of "transactions and activity." *AT&T II*, 357 Or at 715. In *AT&T II*, that income-producing activity was providing telephone service; component activities of providing telephone service included accessing local carriers and transmitting data. *See id.* at 701 (identifying direct costs of a telephone call).

Here, the parties allege multiple income-producing activities associated with one item of income. Plaintiffs allege the following: the provision of the eCampus platform and the work of the faculty, curriculum design team, and Graduation Team—the latter composed of enrollment representatives, financial advisors, and academic counsellors. Defendant agrees that the first three of those activities were income-producing activities but disputes whether the activities of the Graduation Team were income-producing activities under ORS 314.665(4).

Despite the terminology employed by the parties, the court understands them to be alleging that the respective activities were components of whatever income-producing activity was associated with the item of income. The court's analysis will identify the income-producing activity and determine whether the parties' proposed activities are among its components.

What was the income-producing activity associated with receiving income from a course section? The evidence suggests two possibilities: student graduation or the provision of a course section. As discussed above, the test between those possibilities is what service the university obliged itself to perform in exchange for an item of income. Given that test, the income-producing activity must be the provision of a course section.

A major selling point for the university was that its students—many of whom had

previously struggled to earn a college degree—would be able to graduate. But the university did not oblige itself to graduate every student that paid tuition for a single course section. The university encouraged graduation as part of its business plan to "promote retention and degree completion." But student graduation did not produce income in itself. In fact, graduation would end the income stream from a particular student, unless that student opted to pursue another degree at the university.

The university received tuition and fees in exchange for providing instruction and formal evaluation in a single course section. That, not graduation, was the income-producing activity. Viewing the university in its aspect as a business, the process of earning credit toward a degree resembled a customer-loyalty program. The prospect of earning credits toward graduation motivated students to register again and again, increasing the university's sales of course sections.

Most of the activities of Graduation Team members were directed toward the graduation of the students and prospective students with whom they worked. Enrollment representatives recruited students, helped them see graduation as a valuable and achievable goal, and provided non-course-specific aid in the use of the eCampus. Academic counsellors provided non-course-specific advice to newly enrolled students and subsequently contacted students during transition periods, when they were at a heightened risk of not continuing their degree programs. Financial advisors worked with students to plan how to fund not just their current course section, but their future course sections as well.

Plaintiffs' witnesses testified to their conviction that the Graduation Team's work was essential to the success of the university's students. Their testimony was credible, and the court does not doubt the personal commitment of Plaintiffs' witnesses to the university's students.

Furthermore, the court does not doubt the soundness of the university's business decision to promote student graduation through the Graduation Team. But if the Graduation Team increased the university's bottom line, it did so because it resulted in more course section registrations. The Graduation Team worked to remove barriers—informational, personal, and financial—that kept students from registering for their next class. It was the course section, not the services of the Graduation Team, that the university obliged itself to provide when it accepted tuition and fees. The university was free to restructure the way it provided Graduation Team services, and the testimony of Plaintiffs' witnesses alluded to a restructuring that took place after the tax periods in question. The Graduation Team's work was not part of Plaintiffs' income-producing activity under ORS 314.665(4).

The court accepts that the eCampus platform, the curriculum development team, and the faculty were components of providing course sections. The university was obliged to provide an instructor, a curriculum, and an online classroom environment once it accepted tuition and fees for enrollment in an online course section.

2.      *Plaintiffs' Direct Costs of Performance*

OAR 150-314-0435(4) clarifies that the relevant costs of performance are the "direct costs" incurred "to perform the income producing activity that gives rise to the particular item of income." Direct costs of an income-producing activity are "incremental costs," as described by the Supreme Court in *AT&T II*: "The direct costs of the income-producing activity, each individual phone call or monthly flat-rate billing, are only those incremental costs associated with each individual call or billing, not overall network costs." *AT&T II*, 357 Or at 716. In the

/ / /

case of the automated network at issue in *AT&T II*, that incremental cost was "very small"—the

access charge to use another company's network and the cost of the electricity for that call. *Id*.

Here, the court has found that the university's income-producing activity of providing course sections was composed of its faculty, its curriculum development team, and its eCampus platform. With respect to the faculty, both parties identified faculty costs as direct costs, and Defendant does not dispute that Plaintiffs' cost study accurately reported the amounts and locations of those costs for the periods ending in 2009 and 2010. (Def's Post-Trial Br at 23.) The court accepts the parties' agreement on that issue.

The evidence does not show that the provision of a single course section caused Plaintiffs to incur an incremental cost for the curriculum development team's work. The curriculum development team worked to develop *courses* rather than course *sections*. Its work resembled the work of chefs at a restaurant chain's headquarters, updating the menu and redesigning recipes. Just as the restaurant sells individual meals, not recipes, the university sold course sections rather than courses. Developing and updating courses to keep the university's "menu" appealing to its customers was a sound business strategy, but it was not an incremental cost for each course section offered. The cost of the curriculum development team's work was not a direct cost of providing a single course section.

Likewise, on the evidence before the court, the eCampus costs were not direct costs. The costs ascribed to the eCampus in Plaintiffs' cost study were drawn from a data file (not included with the study) composed of "the specific costs incurred to operate and maintain the Online Classroom (eCampus), the locations in which PSD employees work and the manner in which the technology supports [the university] * * * and other Apollo subsidiaries." (Ptfs' Ex 11 at 37.) Costs of operating and maintaining an automated network are not direct costs except to the extent they increase with each individual sale. *See AT&T II*, 357 Or at 716. Plaintiffs have not

presented evidence of an incremental eCampus cost associated with providing a course section.

        3.      *The Greater Proportion of Plaintiffs' Income-Producing Activity*

This court has jurisdiction to determine the correct amount of a tax deficiency, even if the grounds for the court's determination differ from the grounds of the department's original assessment, provided the department timely asserted the new grounds for the deficiency. ORS 305.575. Here, Defendant timely asserted its new grounds for calculating the deficiency based on the application of ORS 314.665(4).

As shown above, Plaintiffs' only direct costs for providing course sections were faculty costs. Using only the faculty cost data provided by Plaintiffs, Defendant calculated that Plaintiffs' Oregon receipts were $28,235,470 for the period ending 2009 and $45,530,635 for the period ending 2010. (Def's Post-Trial Br at 23.) Plaintiffs did not dispute that calculation in their reply brief.

For the period ending 2011, Plaintiffs did not submit a cost study showing where its costs of performance were incurred. Plaintiffs therefore did not meet their burden of proof as to the period ending 2011. *See* ORS 305.427. Furthermore, the court does not have sufficient evidence to make its own determination as to the correct deficiency for that period. Therefore, Defendant's assessment for the period ending 2011 will be upheld.

C.    *Penalties*

Plaintiffs challenge two penalties imposed by Defendant: the failure-to-pay penalty under ORS 314.400 and the substantial-understatement penalty under ORS 314.402.

With respect to the failure-to-pay penalty, Plaintiffs do not dispute the imposition of the penalty. Instead, Plaintiffs argue that Defendant "disregard[ed] that good and sufficient cause exists to waive the penalty." (Ptfs' Reply Br at 31.) For authority, Plaintiffs cite

ORS 305.145(4), the discretionary waiver statute, and its accompanying regulations. It is well established that there is no appeal to this court from any portion of an order "denying the discretionary waiver of penalty or interest by the Department of Revenue." ORS 305.560(1)(a); *Pelett v. Dept. of Rev.*, 11 OTR 364, 366 (1990). This court does not have authority to overturn Defendant's denial of a waiver of the failure-to-pay penalty.

With respect to the substantial-understatement penalty, Plaintiffs again challenge Defendant's denial of a waiver, this time under ORS 314.402(6)—another discretionary waiver statute:

> "The department may waive all or any part of the penalty imposed under this section on a showing by the taxpayer that there was reasonable cause for the understatement or any portion thereof, and that the taxpayer acted in good faith."

Plaintiffs argue that the substantial-understatement penalty should be abated because they had "reasonable cause and acted in good faith." (Ptfs' Opening Br at 39.) Once again, there is no appeal to this court from Defendant's denial of a discretionary waiver.[5] *See* ORS 305.560(1).

### III. CONCLUSION

In conclusion, for the purposes of ORS 314.665(4) the "income-producing activity" of providing course sections from the University of Phoenix's online campus was composed of faculty, curriculum development, and eCampus activities, and only the faculty costs were direct costs to be used in calculating the sales factor numerator. The data in Plaintiffs' cost study suffice for the court to determine the correct amount of deficiency for the periods ending 2009

/ / /

and 2010, but not for the period ending 2011. The court lacks authority to review Defendant's

---

[5] Plaintiffs did not allege that any part of the difference between their reported income and adjusted income was excluded from the definition of an understatement pursuant to ORS 314.402(4)(b).

denials of discretionary penalty waivers.  Now, therefore,

IT IS THE DECISION OF THIS COURT that, for the periods ending in 2009 and 2010, Plaintiffs' Oregon receipts from the University of Phoenix's online campus are as calculated using only the faculty cost data from their cost study, or $28,235,470 and $45,530,635, respectively.

IT IS FURTHER DECIDED that, for the period ending 2011, Plaintiffs' appeal is denied.

IT IS FURTHER DECIDED that Plaintiffs' appeal of Defendant's denial of discretionary penalty waivers is dismissed.

_____

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Lundgren and entered on August 24, 2017.*