ATTORNEYS FOR PETITIONER:
**RANDAL J. KALTENMARK**
**ZIA MOLLABASHY**
BARNES & THORNBURG LLP
Indianapolis, IN

**JENNY A. AUSTIN**
**THEODORE R. BOTS**
BAKER & MCKENZIE LLP
Chicago, IL

**SCOTT L. BRANDMAN**
BAKER & MCKENZIE LLP
New York, NY

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
INDIANA ATTORNEY GENERAL
**WINSTON LIN**
**PARVINDER K. NIJJAR**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN



FILED

Nov 30 2017, 3:08 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

---

THE UNIVERSITY OF PHOENIX, INC., )
　　　　　　　　　　　　　　　　　　)
　　　Petitioner, )
　　　　　　　　　　　　　　　　　　)
　　　　　　v. )　　Cause No. 49T10-1411-TA-00065
　　　　　　　　　　　　　　　　　　)
INDIANA DEPARTMENT OF STATE )
REVENUE, )
　　　　　　　　　　　　　　　　　　)
　　　Respondent. )

---

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**NOVEMBER 30, 2017**

WENTWORTH, J.

　　The University of Phoenix, Inc. challenges the Indiana Department of State Revenue's assessments of adjusted gross income tax (AGIT) for the 2009, 2010, and 2011 tax years. The question is whether the University's online campus revenue can be

sourced to Indiana based on a student's Indiana billing address. The Court finds that it cannot.

## FACTS AND PROCEDURAL HISTORY

The University, a wholly-owned subsidiary of Apollo Education Group, Inc., is a private, accredited education service provider headquartered in Phoenix, Arizona. (Second Stip. of Facts ("Second Stip.") ¶¶ 1, 4, 35.) The University's educational model is directed toward students attempting to balance the demands of taking college classes with the demands of work and/or family life. (Trial Tr. at 32-33, 35-36, 80-81, 114-15.) The University offers associate's, bachelor's, master's, and doctoral courses and degrees in a variety of fields at both its online campus and its ground campus locations throughout the United States. (Second Stip. ¶ 34; Trial Tr. at 31.)

Online campus students participate in academic activities online, such as class meetings and study groups, discussions with instructors or fellow students, online research, accessing course materials, paying for courses, getting grades, and requesting transcripts. (Second Stip. ¶ 37.) In addition, online campus students are permitted to access facilities and resources at the ground campus locations. (Second Stip. ¶ 38.)

During the years at issue, the University's online campus offered classes year-round to students in "sections" that were newly launched weekly. (Second Stip. ¶ 41.) Students could access the sections at any time or location. (Trial Tr. at 35-36.) Online campus associate degree class sections are nine weeks long, and students enroll in one or two courses at a time. (Second Stip. ¶ 40.) The other online class sections are five to eight weeks long, and students complete them one at a time - sequentially rather than concurrently. (Second Stip. ¶ 40.) Students pay for each course as they attend them.

2

(Second Stip. ¶ 42.)

The University's online educational services fall within four general categories: the online eCampus platform, online faculty instruction, curriculum development, and graduation assistance. (See generally Second Stip. ¶¶ 37, 48, 67, 72; Trial Tr. at 233-34; Pet'r Trial Ex. 1 at 4.) First, the University's eCampus provided a web-based platform for students to access its educational services online. (Second Stip. ¶¶ 37, 39.) The eCampus platform contained student resources and the online classroom environment – where students attended class, participated in discussions and projects, communicated with faculty, turned in assignments, and reviewed grades. (Second Stip. ¶¶ 37, 39.) The eCampus platform was developed and maintained from locations in Arizona, Washington, and California, but during 2011, one individual performed services related to the eCampus from Indiana. (Second Stip. ¶ 20, Ex. S at 13; Trial Tr. at 460-61.)

Second, the University provided online classroom instruction taught by faculty members to the students enrolled in each class section. (Second Stip. ¶¶ 41, 72-74; Trial Tr. at 180-82, 289-90.) Faculty members were able to teach online course sections from any location. (Trial Tr. at 181.) During each of the years at issue, the University had more than 1,500 online campus faculty members located in Arizona while just 293 online faculty members were located in Indiana in 2009, 354 in 2010, and 350 in 2011. (Second Stip. ¶ 20, Ex. S at 2-3, 7-8, 12-13.)

Third, the University had a curriculum team that centrally developed the online curricula to maintain consistency across course sections. (Trial Tr. at 151-56.) The curriculum development team created each course section's online classroom and posted all the course materials online. (Trial Tr. at 172-74.) All the University's curriculum

3

development activities were performed outside of Indiana, primarily in Arizona, during the years at issue. (Trial Tr. at 155.)

Finally, the University assigned a graduation team to each student to assist them in completing their degree program. (Second Stip. ¶ 48; Trial Tr. at 58-59, 86-91.) Each team included an enrollment representative, an academic advisor, and a financial advisor. (Second Stip. ¶ 48; Trial Tr. at 58-62, 86-91.) The enrollment representative maintained contact with a student through their first two courses to help them with classroom participation, attendance, study habits, and time management. (Second Stip. ¶ 50; Trial Tr. at 56-58, 86-87.) The academic advisor helped the student manage program requirements, policies, and course scheduling. (Second Stip. ¶¶ 57-59; Trial Tr. at 58-59; 84, 90-91.) The financial advisor ensured that the student had access to the funding necessary to pay the cost of obtaining a degree. (See Second Stip. ¶¶ 63-65; Trial Tr. at 129-31.) More than 6,000 graduation team members who assisted online campus students were located in Arizona and only three were located in Indiana in 2009, one in 2010, and none in 2011. (See Second Stip. ¶ 20, Ex. S at 2-3, 7-8, 12-13; Trial Tr. at 85-86, 118.)

The University filed Form IT-20 Indiana Corporation Adjusted Gross Income Tax Returns for each of the years at issue. (Second Stip. ¶¶ 11-16, Exs. O-Q.) In computing its Indiana adjusted gross income (AGI), the University sourced 100 percent of its receipts attributable to its Indiana ground campus students to Indiana, but sourced none of its receipts from its online campus students to Indiana. (Second Stip. ¶¶ 17-18.)

Upon audit, the Department issued its report stating that the University should have sourced all receipts from online students with an Indiana billing address to Indiana.

4

(Second Stip. ¶¶ 21-25, Ex. T at 4.) Accordingly, the Department issued Proposed Assessments for additional AGIT liabilities, interest, and penalties. (Second Stip. ¶¶ 22, 24, Ex. U.)

On June 20, 2013, the University protested the Proposed Assessments. (Second Stip. ¶ 26.) On September 11, 2014, the Department denied the University's protest of the additional AGIT assessments, but abated the penalties for each of the years at issue. (Second Stip. ¶ 29, Ex. V.)

On November 7, 2014, the University filed its original tax appeal. The Court held the trial from February 28 through March 1, 2017, and heard oral argument on June 22, 2017. Additional facts will be supplied if necessary.

## STANDARD OF REVIEW

This Court reviews final determinations of the Department de novo. See IND. CODE § 6-8.1-5-1(i) (2017). Accordingly, the Court is not bound by either the evidence or the issues presented to the Department at the administrative level. See Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied. "The notice of proposed assessment is prima facie evidence that the [D]epartment's claim for the unpaid tax is valid." I.C. § 6-8.1-5-1(c) (emphasis added). As a result, "[t]he burden of proving that the proposed assessment is wrong rests with the person against whom the proposed assessment is made." I.C. § 6-8.1-5-1(c).

## LAW

In Indiana, every corporation is subject to a tax "on [the] part of the adjusted gross income derived from sources within Indiana[.]" IND. CODE § 6-3-2-1(b) (2009) (amended 2011). Income derived from Indiana sources is determined by multiplying a

5

corporation's total business income by an apportionment factor. See IND. CODE § 6-3-2-2(b) (2009). During the years at issue, Indiana followed a multi-factor apportionment formula that included a weighted sales factor, a property factor, and a payroll factor. See I.C. § 6-3-2-2(b).

The sales factor is a fraction that puts the taxpayer's worldwide gross receipts during the tax period as the denominator and the taxpayer's sales sourced to Indiana during that period as the numerator. See I.C. § 6-3-2-2(e). Receipts from the sales of other than tangible personal property, like the sales of educational services at issue here, are sourced to the Indiana numerator if:

> (1) the income-producing activity is performed in this state; or
>
> (2) the income-producing activity is performed both within and without this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

I.C. § 6-3-2-2(f). Moreover, the Department has explained that

> Gross receipts from transactions other than sales of tangible personal property shall be included in the numerator of the sales factor if the income-producing activity which gave rise to the receipts is performed wholly within this state. Except as provided below if the income producing activity is performed within and without this state such receipts are attributed to this state if the greater proportion of the income producing activity is performed here, based on costs of performance.
>
> The term "income producing activity" means the act or acts directly engaged in by the taxpayer for the ultimate purpose of obtaining gains or profit. Such activity does not include activities performed on behalf of the taxpayer, such as those conducted on its behalf by an independent contractor. Accordingly, "income producing activity" includes but is not limited to the following: (1) The rendering of personal services by employees or the utilization of tangible and intangible property by the taxpayer in performing a service. (2) The sale, rental, leasing, or licensing the use of or other use of tangible personal property. (3) The sale, licensing the use of or other use of

6

intangible personal property.

Income producing activity is deemed performed at the situs of real, tangible and intangible personal property or the place where personal services are rendered.

\* \* \* \* \*

The term "costs of performance" means direct costs determined in a manner consistent with generally accepted accounting principles and in accordance with accepted conditions or practices in the trade or business of the taxpayer.

45 IND. ADMIN. CODE 3.1-1-55 (2009). This case is the first to consider the contours of the apportionment of service income under Indiana Code § 6-3-2-2(f).

**ANALYSIS**

The Department's Proposed Assessments constitute prima facie evidence that the University's revenue received from online educational services provided to students with Indiana billing addresses was correctly sourced to Indiana. See I.C. § 6-8.1-5-1(c). The University claims, however, that the Department's Proposed Assessments are incorrect for three reasons. First, the University asserts that it directly engaged in four "income-producing activities," as that term is used in Indiana Code § 6-3-2-2(f). (See Pet'r Post-Trial Br. ("Pet'r Br.") at 9, 11, 18, 22 (citing I.C. § 6-3-2-2(f)).) Second, the University claims that because its income-producing activities were performed both inside and outside Indiana, the Department's market-based sourcing method was contrary to the statutory method required by Indiana Code § 6-3-2-2(f)(2). (See Pet'r Br. at 15-18.) Finally, the University asserts that its online educational services revenue should not be sourced to Indiana because a greater proportion of its income-producing activities were performed outside of the state. (See Pet'r Br. at 18-24.)

7

# I. Income-Producing Activities

Indiana apportions business income received from performing services based on the geographic location of the income-producing activities. See I.C. 6-3-2-2(f). If the income-producing activities are wholly within Indiana, the service income is sourced entirely to Indiana. I.C. 6-3-2-2(f)(1). If, however, the income-producing activities are performed both in Indiana and in other states, the service income is sourced entirely to Indiana only if a greater proportion of them are performed in Indiana than are performed in any other state. I.C. 6-3-2-2(f)(2). Therefore, deciding which subsection applies first requires identifying the income-producing activity.

The University asserts that it directly engaged in four identified income-producing activities. (See Pet'r Br. at 18.) In support, the University presented, among other things, the testimony of its expert witness in cost accounting, James D. Allen III, and the cost study he prepared. (See Trial Tr. at 207-13, 227, 231-32, 276-77; Pet'r Trial Ex. 1 at 3, 33-36.) The cost study addressed four questions: (1) what were the University's items of income; (2) what were the income-producing activities associated with the items of income; (3) what were the direct costs incurred in performing those income-producing activities; and (4) where were those direct costs incurred? (Pet'r Trial Ex. 1 at 4; Trial Tr. at 276.) Accordingly, the cost study identified (1) the University's income-producing activities, and (2) the location and costs of performing those income-producing

activities for the years at issue.[1]  (See Pet'r Trial Ex. 1 at 4-5; Trial Tr. at 276-77.)

The cost study defined the University's income-producing activities as those activities that directly benefitted a student.  (See Trial Tr. at 283-85, 290 (stating that "the service that [students are] actually paying for is directly associated with the income-producing activities").)  Accordingly, certain activities, such as information technology, training, and candidate qualification, were not considered income-producing activities because they were a step removed from the student attending a class.  (See Trial Tr. at 290-295.)

Then, the cost study grouped the University's activities that directly benefited students into four categories of income-producing activities:  (1) the eCampus platform, (2) classroom instruction, (3) curriculum development, and (4) the graduation team.  (Pet'r Trial Ex. 1 at 4; Trial Tr. at 233-34.)  The cost study identified activities related to the University's eCampus and its online classroom instruction as directly benefiting students because they facilitated interactions and the exchange of information in the online classroom.  (See Pet'r Trial Ex. 1 at 15, 20; Trial Tr. at 286, 289-90.)  Curriculum development activities directly benefited students because  they resulted in the University's program content.  (See Pet'r Trial Ex. 1 at 15, 20; Trial Tr. at 287.)  Finally, the graduation team's activities directly benefited students because they ensured students were properly enrolled in courses, correctly aligned with their degree

---

[1] Mr. Allen is a partner at BI Solutions Group, LLC, specializing in cost accounting for service industries.  (See Pet'r Trial Ex. 1 at 33-36; Trial Tr. at 207-13, 224-25.)  Mr. Allen prepared a cost study for Apollo to determine where the University delivered its services with respect to all states or jurisdictions.  (See Trial Tr. at 347-48.)  Mr. Allen employed an aggregate or operational-level approach to the cost study upon which the University relies, although he also provided a cost study using a transactional-level approach in the event the Court determined Indiana law required that approach. (See Pet'r Trial Ex. 1 at 4; Oral Arg. Tr. at 26-27; Third Stip. of Facts ¶ 9, Ex. YY.)

programs, and had the means to finance the necessary courses for graduation. (See Pet'r Trial Ex. 1 at 14; Trial Tr. at 287-90.)

The Department, on the other hand, contends that the University's "only literal and statutory income-producing activity – [the University] providing the opportunity to attend a class online in return for payment and an Indiana resident agreeing to do so – was performed in Indiana." (See Resp't Br. at 7). As applied to these facts, the Department explains that "income-producing activities" are "[t]he indispensable acts . . . that lead to the production of income [that] occur when an Indiana resident – at home, in a coffee shop, or in a public library – is presented with the offer to take a class, accepts, and attends that class." (See Resp't Br. at 7-8 (citing 45 I.A.C. 3.1-1-55 ("'Income[-]producing activity is deemed performed at . . . the place where personal services are rendered'")).) Accordingly, the Department's definition of "income-producing activities" derives from the student/buyer's perspective, focusing on the activities that provide a student the opportunity to attend an online class in return for the student's payment for that class. (See Resp't Br. at 7). This definition, however, is not consistent with the use of the term "income-producing activity" in the sourcing statute or its interpretive regulation. See I.C. § 6-3-2-2(f); 45 I.A.C. 3.1-1-55.

Indiana Code § 6-3-2-2(f) sources a taxpayer's revenue to the Indiana numerator based on the seller's acts: the performance of acts from the perspective of sales, thus, the seller, not from the view of the buyer or consumer - to generate income. See I.C. § 6-3-2-2(f). The Department's regulation takes the same view, stating that the term "'income producing activity' means the act or acts directly engaged in by the taxpayer for the ultimate purpose of obtaining gains or profit." 45 I.A.C. 3.1-1-55 (emphasis added).

10

Accordingly, income producing activities are not limited to what those students directly pay for, as the Department urges, but encompass acts a seller directly engaged in with the purpose to generate revenue.

It bears stating that the Department did not put forth any probative evidence, testimony or otherwise, in support of its own claims or to rebut the University's evidence. (See Trial Tr. at 486.) See also Miller Pipeline Corp. v. Indiana Dep't of State Revenue, 52 N.E.3d 973, 979 (Ind. Tax Ct. 2016) (finding the Department failed to rebut the taxpayer's evidence where it did not present its own evidence or impeach the taxpayer's testimony). Indeed, the Department merely attempted to cast doubt on the reliability of the University's evidence in cross-examination and by putting forth alternative legal standards unsupported by any evidence or full-throated reasoning. The Department's lack of evidence in rebuttal together with the compatibility of the University's identification of its income-producing activities with the language of the statute and regulation persuades the Court that the University properly defined its income-producing activities in this matter.

## II. Costs of Performance Sourcing

Second, the University claims that because its income-producing activities were performed both inside and outside Indiana, the Department's market-based sourcing method was contrary to the statutory method required by Indiana Code § 6-3-2-2(f)(2). (See Pet'r Br. at 15-18.) When income-producing activities are performed both in Indiana and in other states, the service income is sourced under Indiana Code §6-3-2-2(f)(2), which sources income from the sale of services entirely to Indiana only if a greater proportion of the income-producing activities are performed in Indiana than are performed

11

in any other state.  <u>See</u> I.C. 6-3-2-2(f)(2).  Moreover, the statute deems the location of the greater proportion of income-producing activities to be where the greater proportion of the <u>costs</u> of performing the income-producing activities are located.  <u>See</u> I.C. § 6-3-2-2(f)(2).  Consequently, the statute requires a cost-based analysis, not a market-based or customer-based analysis to determine where to source receipts from service income.[2]

The University's cost study identified and geographically located the direct costs the University incurred in performing its four income-producing activities, concluding that they occurred in Indiana as well as in other states.  (<u>See</u> Pet'r Trial Ex. 1 at 5, 30; <u>see also</u> <u>generally</u> Second Stip. ¶ 20, Ex. S.)  The Department provided no evidence in rebuttal.  As a result, the Court is persuaded that the income-producing activities were performed both in Indiana and in other states, and therefore, the University's online educational services income must be sourced under Indiana Code § 6-3-2-2(f)(2).

The Department does not dispute that it used a market-based method to source the University's online income to Indiana.  (<u>See</u> Oral Arg. Tr. at 28-31, 58-61.)  Indeed, the Department sourced all the receipts from students with Indiana billing addresses to the Indiana numerator.  (Second Stip. ¶¶ 23, 25, Ex. T at 4-6.)  Moreover, the Department did not present facts or argument to show it was entitled to use market-based sourcing as an alternative apportionment method to the cost-based method required under Indiana Code § 6-3-2-2(f)(2).  <u>See</u>, <u>e.g.</u>, I.C. § 6-3-2-2(*l*) (requiring the party seeking

---

[2] Indiana Code § 6-3-2-2(f) mirrors Section 17 of the Uniform Division of Income for Tax Purposes Act ("UDITPA"), which sets forth a cost-based method for sourcing service receipts.  <u>See</u>, <u>e.g.</u>, <u>Miller Brewing Co. v. Indiana Dep't of State Revenue</u>, 903 N.E.2d 64, 71 (Ind. 2009) (noting that Indiana's statutory apportionment formula tracks the language of UDITPA).  Although some states have deviated from Section 17 of UDITPA by expressly enacting statutes to source service receipts under a customer location or market-based method, Indiana has not.  <u>See</u>, <u>e.g.</u>, ME. REV. STAT. ANN. tit. 36, § 5211(16-A) (2017); MICH. COMP. LAWS § 208.1305(2)(a) (2017).

alternative apportionment to demonstrate that sourcing income under I.C. 6-3-2-2(f)(2) does not fairly reflect the taxpayer's business conducted in Indiana and that the alternative sourcing method is reasonable).  As a result, the Department's market-based sourcing method used to calculate the Proposed Assessments is contrary to the explicit direction in Indiana's sourcing statute.[3]  See I.C. § 6-3-2-2(f)(2).

### III.  The Greater Proportion of Income-Producing Activities

Finally, the University asserts that none of its online educational services income should be sourced to Indiana because a greater proportion of its income-producing activities were performed outside of the state.  (See Pet'r Br. at 18-24 (citing I.C. § 6-3-2-2(f)(2)).)  Indiana Code § 6-3-2-2(f)(2) provides an "all-or-nothing" method for sourcing service income:  if the greater proportion of the costs of performing the income-producing activities are performed within Indiana, all the service income is attributed here.  See I.C. § 6-3-2-2(f)(2).  Moreover, if the greater proportion of the costs are incurred outside the state, none of the income is attributed to Indiana.  See I.C. § 6-3-2-2(f)(2).

The University's cost study identified and geographically located the direct costs the University incurred in performing its four income-producing activities as follows:  in 2009, costs of $410,381,000 in Arizona versus $4,796,000 in Indiana; in 2010, costs of $492,300,000 in Arizona versus $5,128,000 in Indiana; and in 2011, costs of

---

[3] The University has additionally claimed that the Department read Indiana Code § 6-3-2-2(f) in a manner that uses market-based sourcing for out-of-state taxpayers and cost-based sourcing for in-state taxpayers, violating the Due Process and Commerce Clauses of the United States Constitution and the Equal Protection provisions of the United States and Indiana Constitutions.  (See Pet'r Post-Trial Br. ("Pet'r Br.") at 17-18.)  Given the Court's holding on the requirements of Indiana Code § 6-3-2-2(f), the Court does not address the University's claim.

$478,645,000 in Arizona versus $6,226,000 in Indiana.[4]  (See Pet'r Trial Ex. 1 at 5, 30.) It therefore concluded that the greater proportion of the University's costs of performing its four income-producing activities were incurred in Arizona.  (See Pet'r Trial Ex. 1 at 5, 30; Trial Tr. at 235.)

The Department claims that the University's identification and location of the costs it incurred to perform its income-producing activities is unreliable and thus fatal to its position because the cost study was based on an operational-level approach rather than a transaction-by-transaction approach.  (See Resp't Br. at 3-10; Oral Arg. Tr. at 57, 60-62, 64-66.)  In preparing the cost study, the University does not dispute that Mr. Allen employed an aggregate or operational-level approach, which looked at the operations of the University across its national platform.  (See Pet'r Trial Ex. 1 at 4; Trial Tr. at 347-48, 352.)  The Department specifically maintains that the University's cost study instead should have identified the income-producing activities and determined their associated direct costs on a transaction-by-transaction basis – looking at each transaction that produced income.  (See Resp't Br. at 3-6 (citing AT&T Corp. v. Dep't of Revenue, 358 P.3d 973 (Or. 2015); Cable One, Inc. v. Idaho State Tax Comm'n, 337 P.3d 595 (Idaho 2014)).)

The Department's argument relies on out-of-state case law based on state-specific administrative regulations that define an income-producing activity.  See AT&T, 358 P.3d at 975.  See also Cable One, 337 P.3d at 599.  For example, Oregon's regulation explains that "[t]he term 'income-producing activity' applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer . . . for the ultimate

_____

[4] The stated values are the amount of direct costs incurred for all four of the income-producing activities combined, separated only by year and location.  (See Pet'r Trial Ex. 1 at 5, 30.)

14

purpose of obtaining gains or profit." See AT&T, 358 P.3d at 975 (citation omitted). Likewise, Idaho's regulatory language defines an income-producing activity with identical language to that in Oregon's regulation. See Cable One, 337 P.3d at 599 (examining Idaho's regulation defining income-producing activity). But cf. Boston Prof'l Hockey Ass'n v. Comm'r of Revenue, 820 N.E.2d 792, 797 (Mass. 2005) (discussing Massachusetts' regulation defining income-producing activity as "[a] transaction, procedure, or operation directly engaged in by a taxpayer which results in a separately identifiable item of income" (citation omitted)).

The Department submits that the plain language of its regulation stating that "[g]ross receipts from transactions other than sales of tangible personal property shall be included in the numerator" requires the use of a transaction-by-transaction methodology just like the Oregon and Idaho regulations. (See Resp't Br. at 3 (quoting 45 I.A.C. 3.1-1-55).)  Indiana's regulation, however, does not refer to looking at each separate item of income; instead, it defines an income-producing activity more broadly as "the act or acts directly engaged in by the taxpayer for the ultimate purpose of obtaining gains or profit." See 45 I.A.C. 3.1-1-55.  To find that a transaction-by-transaction approach is required merely because the word "transactions" appears in the regulation, would be tantamount to forcing a square peg into a round hole.  Rather, the use of the word "transactions" in 45 IAC 3.1-1-55 describes what type of transactions are subject to the regulation's direction, i.e., transactions from sales of other than tangible personal property. See 45 I.A.C. 3.1-1-55. Accordingly, the word "transactions" is used to identify what the regulation applies to, not how it is to be applied.

In a case of first impression, as we have here, the Court may properly consider the

reasoning in cases from other jurisdictions.  See Linton v. Davis, 887 N.E.2d 960, 967-68 (Ind. Ct. App. 2008) (using out-of-state case law as guidance when deciding issues of first impression), trans. denied.  Nonetheless, the Court will not read into the law, whether a statute or a regulation, language that is simply not there.  See DeKalb Cnty. E. Cmty. Sch. Dist. v. Dep't of Local Gov't Fin., 930 N.E.2d 1257, 1260 (Ind. Tax Ct. 2010) ("When the language of a statute is clear and unambiguous, the Court may not expand or contract the meaning of a statute by reading into it language to correct any supposed omissions or defects" (citation omitted)); see also State Bd. of Tax Comm'rs v. Two Market Square Assocs. Ltd. P'ship, 679 N.E.2d 882, 886 (Ind. 1997) (explaining that the Court will not give weight to an agency's interpretation of an administrative regulation that is inconsistent with the language of the regulation itself).  Under Indiana's regulation, therefore, the University was not required to use a transaction-by-transaction approach as the basis of its cost study.  Accordingly, the University's cost study is probative evidence that the Court finds persuasively demonstrates that the greater proportion of the University's income-producing activities were performed outside of Indiana.

## CONCLUSION

After weighing the evidence and for all the reasons stated above, the Court holds that the Department erroneously calculated the Proposed Assessments for 2009, 2010, and 2011 by sourcing the University's revenue according to the location of its market, rather than the location of the costs of its income-producing activities as required by Indiana Code § 6-3-2-2(f)(2).  The Court further finds persuasive the University's calculation of its Indiana sourced income reported on its original tax returns for the years at issue.  As a result, the Department's Proposed Assessments are vacated.

16