IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| VESTA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 200019G |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | **ORDER ON CROSS-MOTIONS FOR** |
| Defendant. | ) | **PARTIAL SUMMARY JUDGMENT** |

This matter came before the court on the parties' cross-motions for partial summary judgment. At issue is whether payment processing services performed by third parties under contract with Plaintiff are performed "on behalf of" Plaintiff under ORS 314.665(4) (2009) and former OAR 150-314.665(4)(2) (Aug 31, 2008) for purposes of determining where Plaintiff incurred its costs of performing income-producing activity. The tax years at issue are 2010 and 2011.

## I. FACTS

Plaintiff's clients are certain telecommunications companies (the Telecoms) including AT&T Mobility LLC (the successor to Cingular Wireless, referred to herein as "AT&T"), Sprint, and T-Mobile, all of which offer prepaid wireless services. (Nebel Decl Supp Mot Part Summ J, ¶¶ 7, 13–14.) The Telecoms' customers buy increments of time or data usage ("Additional Time") for their mobile devices via credit card, debit card, or electronic payment over the Automated Clearing House ("ACH") network. (*Id*., ¶¶ 7, 10.) Plaintiff provides the Telecoms with an "integrated payment processing and fraud prevention service," whereby the Telecoms "completely outsource their prepaid mobile Telecom customer recharge and payment process." (Ptf's Reply at 3.)

A.       *Credit Card Payments and Chargebacks*

Most credit card transactions are conducted under the umbrella of Visa or MasterCard, bank card associations with memberships composed exclusively of financial institutions. Office of the Comptroller of the Currency, *Comptroller's Handbook, Merchant Processing, vers. 1.0* (Aug 2014) at 2;[1] Merchants Advisory Group, *Know Your Payments!, Transactions Basics, FAQ.*[2] The bank card associations enable card transactions across a network of four parties: the cardholder; the merchant; the member bank that issued the credit card (the "issuing bank"); and the member bank (or its third-party processor) under contract with the merchant to acquire payments from issuing banks (the "acquiring bank" or "payment acquirer"). *Comptroller's Handbook* at 2. When a card is presented to a merchant, the merchant transmits the card information and transaction amount to its payment acquirer, which forwards that information over the bank card association network to the issuing bank. *Id*. at 8. The issuing bank approves or declines the transaction, and that decision is transmitted back to the point of sale over the same network. *Id*. After a transaction is approved, the issuing bank remits funds to the payment acquirer and posts a charge to the cardholder's account. *Id*. at 9–10. The payment acquirer then pays the merchant, usually by initiating an ACH credit to the merchant's local bank deposit account. *Id*. at 9–10.[3]

After the merchant is paid, there is a period of time during which the cardholder may dispute the transaction for various reasons, including fraud. *Comptroller's Handbook* at 11. In

---

[1] *Available at*: https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/merchant-processing/index-merchant-processing.html (accessed March 28, 2022).

[2] *Available at*: http://www.knowyourpayments.com/transaction-basics/ (accessed March 28, 2022).

[3] Other card issuers—notably American Express, Discover Card, and Diners Club—use a three-party network in which the issuing bank and the payment acquirer are the same entity. *Comptroller's Handbook* at 2.

the case of an unauthorized purchase, the issuing bank begins a chargeback process. *Id*. at 11–12. In that process, the payment acquirer credits the issuing bank and, after appropriate investigation, removes the amount of the chargeback from the merchant's account. *Id*.

Telecom customers purchase Additional Time in "card-not-present" transactions, which "have a higher incidence of chargebacks, due to unauthorized use, than in-person transactions where a physical card is present." (Nebel Decl Supp Mot Part Summ J, ¶¶ 10, 12.)

B.      *Vesta's Service to Telecoms*

Plaintiff protects its clients from the risk of loss due to chargebacks. (*See* Nebel Decl Supp Mot Part Summ J, ¶ 12.) It does so by handling requests from Telecom customers to purchase Additional Time, approving or rejecting those requests based on a proprietary software-based risk assessment, submitting information for approved requests to payment acquirers (standing in as the "merchant" in the payment process described above), receiving payment from those payment acquirers, and remitting the proceeds to the Telecoms, net of Plaintiff's fee. (*Id*., ¶¶ 11, 19, 20, 23.) Plaintiff stands by its assessment of fraud risk by assuming liability for all chargebacks due to unauthorized card use. (*Id*., ¶¶ 12, 19.) According to Plaintiff, its assumption of financial risk was "one of the primary marketing and selling points" for its business. (Compl, ¶ 19.)

Each of Plaintiff's contracts with the Telecoms required it to provide similar services, notwithstanding differences in contract language. Its contract with Cingular (AT&T) required Plaintiff to "collect payments related to Loads from Cingular Customers" while "paying Cingular the Load Amount, regardless of whether the Load Funding Device was used without authorization or the Card issuer issues a chargeback." (Nebel Decl Supp Mot Part Summ J, Ex 1 at 16.) Its contract with T-Mobile required it to provide "payment processing whereby [Plaintiff]

accepts end-user customer payments, processes such payments and provides the settlement" while remaining "responsible for paying T-Mobile the Net Amount * * * regardless of whether the end-user customer subsequently claims that the card was used without authorization and the card issuer issues a chargeback." (*Id*., Ex 2 at 14.) Its contract with Sprint required Plaintiff to "[a]ct as Merchant of Record (as such term is defined by the Card Associations) with respect to all processed Load Requests" and to "[p]ay the Net Remittance to an account designated by Sprint" while remaining "responsible for paying Sprint for such Load, regardless of whether the Load Funding Device was used without authorization and the Card issuer issues a chargeback." (*Id*., Ex 3 at 35.)

C.    *Vesta's Payment Acquirers*

During the years at issue, Plaintiff submitted card transactions primarily through two payment acquirers.[4] In 2010, most of Plaintiff's transactions were submitted to a subsidiary of First National Bank of Omaha ("FNBO"). (Nebel Decl Supp Mot Part Summ J, ¶¶ 24–25.) In 2011, most of the transactions were submitted to Chase Paymentech ("Chase"), a subsidiary of JP Morgan Chase Bank, N.A. (*Id*.)

The Chase contract is captioned "Select Merchant Payment Card Processing Agreement." (Nebel Decl Supp Mot Part Summ J, Ex 4 at 1.) In it, Chase agreed to "process [Plaintiff's] Transaction Data to facilitate the funds transfer between the various Payment Brands and [Plaintiff]." (*Id*., Ex 4 at 2.) Upon receiving transaction data from Plaintiff, Chase agreed to provide Plaintiff with "provisional credit" for the amount received by Chase respecting the transaction, net of Chase's "fees, charges, and discounts," as well as "all adjustments and

---

[4] Plaintiff is not a financial institution and is not eligible for membership in a bank card association. (Compl, ¶¶ 23–24.)

Chargebacks" and a host of other possible charges. (*Id.*, Ex 4 at 3.) Plaintiff undertook to pay Chase any such charges not deducted from the provisional credit. (*Id.*)

The FNBO contract is "an agreement for transaction processing" captioned "Major Merchant Transaction Processing Agreement." (Nebel Decl Supp Mot Part Summ J, Ex 5 at 1.) In that contract, FNBO agreed to "process and submit VISA and MasterCard transactions into the ASSOCIATIONS' Interchanges and to handle the subsequent payment of such SALES" to Plaintiff in exchange for Plaintiff's payment of processing fees. (*Id.*, Ex 5 at 76.) Plaintiff agreed to pay FNBO all chargebacks and any other fees or charges assessed by the bank card associations and to allow FNBO to deduct all such fees and charges from its payments of sales amounts to Plaintiff. (*Id.*, Ex 5 at 2–3.) If a bank card association's fees changed, FNBO reserved the right to "pass along the 'cost of goods sold' " by amending the fees it charged to Plaintiff. (*Id.*, Ex 5 at 2.)

D.    *Assessment and Appeal*

On its 2010 and 2011 returns, Plaintiff took the position that its fees were primarily earned for work performed outside of Oregon because the fees paid to payment acquirers were direct costs of performance. (*See* Compl, ¶ 36, Ex 3 at 6–7, 14–15.) At audit, Defendant's position was that those fees were not direct costs of performance; accordingly, it significantly increased Plaintiff's Oregon income for each year. (*Id.*, Ex 3 at 6–7, 14–15.) Defendant also imposed late-payment penalties and the 20-percent substantial understatement of income penalty. (*Id.*, Ex 3 at 8–11, 16–17.)

On appeal, Plaintiff seeks to reduce its Oregon taxable income by excluding the receipts at issue from the numerator of the sales factor in the apportionment equation and to eliminate the

/ / /

substantial understatement penalties. (Compl at 9.) Defendant asks the court to uphold its assessments. (Answer at 3.)

## II. ANALYSIS

The parties have moved for partial summary judgment on the question of whether the payment acquirers, FNBO and Chase, acted "on behalf of" Plaintiff within the meaning of OAR 150-314.665(4)(2) (Sept 23, 2008), the regulation defining "income-producing activity."

Sales other than sales of tangible personal property are apportioned to Oregon if "a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance." ORS 314.665(4) (2009).[5] Income-producing activity is defined by OAR 150-314.665(4)(2) (Sept 23, 2008) as follows:

> "The term 'income producing activity' applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit. *Income producing activity includes transactions and activities performed on behalf of a taxpayer, such as those conducted on its behalf by an independent contractor.* Accordingly, income producing activity includes but is not limited to the following:
>
> "(a) The rendering of personal services by employees or by an agent or independent contractor acting on behalf of the taxpayer or the utilization of tangible and intangible property by the taxpayer or by an agent or independent contractor acting on behalf of the taxpayer in performing a service.
>
> "* * * * *."

(Emphasis added.) The emphasized portion is a 2008 amendment that specifically includes activities performed on the taxpayer's behalf. That amendment reversed the prior rule, which had instead specifically excluded such activities: "Except as provided otherwise in this rule, such activity does not include transactions and activities performed on behalf of a taxpayer, such as

---

[5] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2009.

those conducted on its behalf by an independent contractor." OAR 150-314.665(4)(2) (Jan 1, 2007).

While OAR 150-314.665(4)(2) (Sept 23, 2008) expands the definition of a taxpayer's "income producing activity" to include activity performed on the taxpayer's behalf by a third party, it does not change the term's central meaning: activity "directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit." Thus, third-party activity is income-producing activity if satisfies two criteria. First, the activity must be of the kind directly engaged in by the taxpayer in its regular profit-seeking business. Second, it must be performed "on behalf of" the taxpayer. The first criterion concerns what kind of activity the payment acquirers perform; the second concerns to whom that activity is attributed.

A.      *Nature of Plaintiff's Income-Producing Activity and the Acquirers' Activity*

Plaintiff's regular profit-seeking activity is spelled out in its contracts with the Telecoms. Although the specific terms of each contract differ, Plaintiff undertakes essentially the same duties for each Telecom. Plaintiff summarizes its income-producing activity as follows:

> "1. approve a Telecom customer request to purchase Additional Time;
> "2. process the purchase request;
> "3. collect the amount due for the purchase from the Telecom customer; and
> "4. remit the proceeds, net of [Plaintiff's] fee, to the Telecom."

(Ptf's Supp Opening Brief at 14 (footnote omitted).) Defendant states its general agreement with Plaintiff's summary, casting Plaintiff's income-producing activity in following terms:

> "[1] handling a Telecom consumer's payment card or electronic check by screening the payment transaction for indicators of fraud, [2] submitting the card transaction for payment, [3] subsequently receiving the Telecom customer's payment, and [4] remitting the payment to the Telecom net of [Plaintiff's] fee."

(Def's Response to Ptf's Supp Opening Brief at 1.)

Under either party's formulation, Plaintiff's income-producing activity included managing the entire credit card transaction with each Telecom customer. After approving customer purchases, Plaintiff submitted transaction data and received payment over the bank card association networks. That series of actions is variously described in the Telecom contracts as "collect[ing] payments" (AT&T/Cingular), "payment processing" (T-Mobile), and "[a]ct[ing] as Merchant of Record" (Sprint).

The Sprint contract's assignment of a specific role—merchant of record—should not be read as by itself excluding activity specific to payment acquirers from Plaintiff's income-producing activity. The more general terms used by the other two contracts, as well as Plaintiff's obligations under all three contracts, show that Plaintiff was responsible for obtaining payment from Telecom customers' issuing banks. If Plaintiff had personally performed the actions of a payment acquirer, it would have been consistent with Plaintiff's contractual responsibilities and in furtherance of its profit-seeking ends. Although Plaintiff is not a financial institution and could not personally perform those actions, a payment acquirer's activities lie within the genus of the activities required of Plaintiff by its contracts with the Telecoms. On its face, Plaintiff's income-producing activity appears capable of encompassing the activity of the payment acquirers.

Defendant objects that Plaintiff's income-producing activity cannot include payment acquisition because Plaintiff cannot perform payment acquisition, being neither a bank nor a financial institution. But counterexamples to that reasoning abound. Independent contractors commonly possess skills or licensures their principals lack, but that are necessary for their principals' income-producing activity; *e.g.*, an electrician hired by a general contractor, or a lawyer hired by a debt collection agency. As will be seen below, the taxpayer in the most

relevant precedent—*AT&T Corp. v. Department of Revenue*, TC 4814, 2012 WL 119850 (Or Tax Reg Div Jan 12, 2012)—was in the business of providing long-distance telecommunications services even though it was unable to connect its customers to those services without paying independent contractors for the use of their networks. A taxpayer's inability to perform a given task alone does not imply that task is not part of its income-producing activity.

The payment acquirers' activity passes the first test: it is of the same kind as Plaintiff's income-producing activity. Whether or not it was part of Plaintiff's income-producing activity depends on whether it was performed "on behalf of" Plaintiff.

B.      *Was the Acquirers' Activity "on Behalf of" Plaintiff?*

Whether the payment acquirers acted "on behalf of" Plaintiff hinges on the meaning of the phrase as used in OAR 150-314.665(4)(2) (Sept 23, 2008). That phrase was also used in OAR 150-314.665(4)(2) (Jan 1, 2007), before the regulation was amended. In *AT&T Corp. v. Department of Revenue*, TC 4814, 2012 WL 119850 at *7–8 (Or Tax Reg Div Jan 12, 2012) ("*AT&T I*"), *aff'd*, 357 Or 691, 358 P3d 973 (2015) ("*AT&T II*"), the Regular Division interpreted "on behalf of" as used in the pre-amendment regulation.

The issue under consideration in *AT&T I* was whether the taxpayer, an interexchange telecommunications carrier, incurred in-state costs of performance by paying access charges to local exchange carriers (LECs) that connected customers' homes to the taxpayer's equipment in Oregon. *AT&T I*, 2012 WL 119850 at *7. Under the regulation as it then stood, acts by independent contractors "on behalf of a taxpayer" were excluded from income-producing activity. OAR 150-314.665(4)(2) (Jan 1, 2007). Thus, if the LECs acted "on behalf of" the interexchange carrier, the access charges would be excluded from the interexchange carrier's

/ / /

costs of performance in the sales factor computation. The taxpayer argued that its payments to the LECs fell under that exclusion. *AT&T I*, 2012 WL 119850 at *7.

The court disagreed, holding that the LECs performed services "for" the taxpayer rather than "on behalf of" the taxpayer. *AT&T I*, 2012 WL 119850 at *7. Describing a dichotomy between performing services "on behalf of a taxpayer" and "providing services or goods *to* the taxpayer," the court gave as an example of the latter the provision of lodging and meals to traveling lawyers. *Id*. (Emphasis original.) In the example, although the hotel and restaurant may provide contractual services to the law firm, their services are not performed on behalf of the law firm. *Id*.

Plaintiff argues that the holding of *AT&T I* "stands for the proposition that not every third party providing services is 'acting on behalf [of]' a taxpayer"—a proposition that is "self-evident" and "has no bearing" on the issue before the court. Plaintiff's point is that the distinction between services "provided to" and "on behalf of" taxpayers is not self-explanatory. Indeed, the distinction requires interpretation before it can be applied.

In deciding whether the LECs acted "on behalf of" the taxpayer, the *AT&T I* court analyzed the relationship between the taxpayer and the independent contractor LECs. After stating its paradigmatic hotel-and-restaurant example, the court reasoned as follows:

> "The evidence in this proceeding indicates that the LEC similarly provides the use of its facilities to taxpayer at a rate set by tariff. This is done without any direct negotiation between taxpayer and the LEC, either as to terms of service or cost. Taxpayer must pay the LEC according to a tariff approved by a government commission. Under that tariff, taxpayer, and not the customer initiating the call is required to make payment. This is so, even though, as the evidence shows, neither the LEC nor taxpayer even instigates the transaction that leads to the LEC charge. Rather, the customer is responsible for the transaction occurring, first by choosing an LEC and secondly by deciding to make an interstate or international call using the services of taxpayer. The LEC is no more performing a service *on behalf of* taxpayer than the hotel or restaurant is performing a service *on behalf of* the law firm in the example. Both the LEC and the hotel, or restaurant, are

providing a service *to* taxpayer for which taxpayer must pay in connection with a specific income producing activity."

*AT&T I*, 2012 WL 119850 at *7 (emphasis original).

The above analysis relies heavily on the fact that the terms of service were not directly negotiated by the taxpayer and the LECs. The rate was "set by tariff * * * without any direct negotiation between the taxpayer and the LEC * * * as to terms of service or cost." *AT&T I*, 2012 WL 119850 at *7. That tariff was "approved by a government commission." *Id.* Even though it was the taxpayer (and not the taxpayer's customer) that was required to pay the LEC, the taxpayer did not even control when a transaction leading to a charge would be initiated. The taxpayer paid the LECs for a contracted service, but the taxpayer had little say in the terms of that service.

That "lack of say" by the taxpayer is the common thread between the LEC transactions and the hotel and restaurant transactions. Hotels and restaurants provide similar kinds of services—lodging and meals, respectively—to all comers, subject to variations of rate and menu. The LECs provide connectivity according to a government-approved tariff, without even the minor negotiations that occur at hotels and restaurants. Neither hotels, restaurants, nor LECs change the kinds of services they provide at the behest of their individual customers. The conclusion to be drawn is that an independent contractor does not act "on behalf of" a taxpayer if its contract with the taxpayer does not determine the nature of its activity.

As stated above, the 2018 amendment to OAR 150-314.665(4)(2) did not change the meaning of the phrase "on behalf of."[6] Indeed, the point of switching from excluding "activities

---

[6] In its motion, Plaintiff initially appeared to have asserted that the amendment broadened the meaning of the phrase such that "[i]f the activities are performed for the benefit of the taxpayer, the contractor is acting on the taxpayer's behalf." (Ptf's Mot Part Summ J at 20.) However, the quoted statement occurred in the context of an argument about whether an independent contractor must be an "agent" to act on a taxpayer's behalf, and Plaintiff later clarified that it had not "argued that *every* third party providing services to a taxpayer is acting on the

performed on behalf of a taxpayer" from income-producing activity to including such activities would be lost if the meaning of the phrase were changed.

In the present case, the documents on file indicate FNBO and Chase were "banks and bank-affiliated credit card payment processors" both before and after they contracted with Plaintiff. (Nebel Decl Supp Mot Part Summ J, ¶ 22.) They did not change the nature of their activity to suit Plaintiff. Indeed, their contracts consist largely of boilerplate spelling out the duties of payment acquirers and merchants, with terms specific to particular merchants—such as fees—relegated to addenda. (*See* Exs 4 at 3, ¶ 9.1; 5 at 2, ¶ 3.1.) Those negotiated terms are analogous to negotiated room rates and menu option at hotels and restaurants; they do not alter the nature of the payment acquisition activity. Under the reasoning of *AT&T I*, it appears that the payment acquirers did not act on behalf of Plaintiff.

Plaintiff's doubts about the applicability of *AT&T I* to these facts do not withstand scrutiny. Plaintiff points out that, unlike the interexchange carrier, it has negotiated contracts with its customers that specified the services it provided. Plaintiff does not explain the distinction's relevance, but perhaps implies that where a taxpayer's contractually mandated services are outsourced, the contractor acts on the taxpayer's behalf. That reasoning is not found in *AT&T I*. Moreover, it is inconsistent with the court's holding in *AT&T I*. The activities at issue in that case were the taxpayer's "long distance services that connect users in Oregon with users in some other state or nation." *AT&T I*, 2012 WL 119850 at *1. That taxpayer clearly had an obligation to its paying customers to connect them with out-of-state users, yet it could not do so without the LECs' networks. Even so, the court held the LECs did not act on behalf of the taxpayer in providing that last-mile connectivity. Here, the similar fact that Plaintiff's payment

taxpayer's behalf." (Ptf's Response to Def's Reply Brief at 8 n 5 (emphasis original).)

processing obligations to the Telecoms were accomplished through the payment acquirers does not imply those payment acquirers acted on Plaintiff's behalf.

Plaintiff further asserts that the transactions here are two-way, with payments passing back and forth through the payment acquirers, as opposed to the "one way" transactions in *AT&T I*, in which the interexchange carrier merely paid the LECs. It is not clear that the distinction has legal relevance, but nevertheless it is a distinction that does not apply under these facts because the transactions at issue in both cases were two-way. In *AT&T*, the transactions at issue were long-distance services, not payment-processing services. Thus, if an analogy were to be made, the proper analogue to two-way money movement by the payment processors would be two-way movement of telecommunication signals by the LECs.

Another purported factual difference is that Plaintiff would have incurred most of the costs at issue even if it had been its own payment processor (because it would have continued to pay interchange and issuing bank fees), whereas in *AT&T I* the taxpayer would not have incurred LEC charges if it could have provided last-mile service. Whatever the effect that scenario might have on apportionment overall, it is not relevant to the issue at hand. The inquiry is not into the cost of the contracted service or its necessity to the taxpayer, but into the nature of the independent contractor's ordinary line of business.

Finally, Plaintiff points out that the payment in *AT&T I* was for use of LEC facilities, whereas the payment here was for services, but once again does not explain the relevance of that distinction. In fact, payments for "personal services" and "utilization of tangible and intangible property" are grouped together in both the 2007 and 2008 versions of OAR 150-314.664(4)(2)(a), suggesting that the distinction is not relevant. As seen above, the analysis in *AT&T I* did not depend on whether payment was for facilities or services.

In sum, the *AT&T I* case is relevant precedent here. Under the reasoning therein, the payment processors provided a service to Plaintiff and did not act on Plaintiff's behalf for purposes of OAR 150-314.664(4)(2)(Aug 31, 2008).

### III. CONCLUSION

The declarations and exhibits on file show that the payment processors' contracts with Plaintiff did not change the nature of the payment processors' services. The payment processors therefore did not act on Plaintiff's behalf for purposes of OAR 150-314.664(4)(2) (Aug 31, 2008). Because there is no genuine issue of material fact and Defendant is entitled to prevail as a matter of law, partial summary judgment is appropriate. *See* TCR 47 C; TCR–MD 13 B.[7] Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Partial Summary Judgment is denied and Defendant's Cross-Motion for Partial Summary Judgment is granted.

IT IS FURTHER ORDERED that the parties shall confer and file a status report no later than May 12, 2022.

Dated this ____ day of March 2022

_____
POUL F. LUNDGREN
MAGISTRATE

***This interim order may not be appealed. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved. ORS 305.501.***

***This document was signed by Magistrate Poul F. Lundgren and entered on March 29, 2022.***

---

[7] Tax Court Rules (TCR); Tax Court Rules – Magistrate Division (TCR–MD)